**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

**BILLY BROWN,**

                **Plaintiff,**

    **v.**

                                 **Case No.3:14-cv-00041-PPS-CAN**

**ALERIS SPECIFICATION ALLOYS,
INC. and WABASH ALLOYS, LLC,**

             **Defendant.**

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant Aleris Specification Alloys, Inc. ("Aleris" or "Defendant"), [1] by counsel, pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 56.1 of the United States District Court for the Northern District of Indiana submits the following Brief in Support of its Motion for Summary Judgment.

## I.    INTRODUCTION

Plaintiff, Billy Brown ("Brown"), earned just under $100,000 annually as a non-union Production Supervisor for Aleris at its Wabash, Indiana facility. Brown exercised supervisory authority over approximately 18 employees on the ingot line. Among his numerous executive responsibilities, he: (1) trained employees; (2) ensured his reports complied with safety regulations; (3) determined needs for overtime staffing and requests for time off; (4) administered progressive discipline; (5) determined materials needed for daily production; (6) directed the ingot line production process; (7) resolved complaints among employees and by

---

[1] Wabash Alloys, LLC, formerly a subsidiary of Aleris International, Inc., was liquidated as part of Aleris International, Inc.'s emergence from bankruptcy effective June 1, 2010. Thus, Wabash Alloys, LLC no longer exists as a legal entity. In addition, effective February 2015, Aleris Specification Alloys, Inc. became known as Real Alloy Specification, Inc.  For the purposes of this motion, we will refer to the Defendant as "Aleris."

employees regarding working conditions; and (8) made evaluations and recommendations on employee status which were given particular weight. Aleris properly classified Brown as an exempt executive employee under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* Brown is not entitled to overtime compensation under the FLSA. Aleris is entitled to summary judgment as a matter of law on the only claim asserted in Brown's Complaint, for unpaid wages pursuant to the FLSA.

## II.   STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[2]

### A.   Aluminum Production at Aleris's Wabash Facility.

Aleris's Wabash, Indiana specification alloy facility (the "Wabash facility") produces molten and ingot aluminum. (Deposition of Billy Brown ("Brown Dep.") at 22:22-23:20). Furnace Power Equipment Operators ("FPEOs"), Furnace Operators ("FOs"), and Utility Equipment Operators ("UTOs") perform the first line production work on the ingot line. (Brown Dep. 24:2-14, 26-23-27:9, 28:16-29:11). FPEOs feed material into the furnace at the top of the production line. (Brown Dep. 26:23-27:9). FOs melt the material in the furnace and pour the resulting molten into molds. (Brown Dep. 28:16-29:11). UTOs produce the ingot off the line when it becomes solid and proceed to stamp, paint, tag, and band the product before sending it to shipping. (Brown Dep. 24:2-14, 29:5-11).

Every new production employee is hired as a UTO, and the Collective Bargaining Agreement ("CBA") negotiated between Aleris and the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers Local 140 (the "Union") then controls seniority and dictates when employees are able to bid to be hired into a different

---

[2] For the purposes of summary judgment only, Defendant interprets all facts in a light most favorable to Brown.

position. (Deposition of Tony Whitt ("Whitt Dep.") at 13:4-14:1; Declaration of Tony Whitt ("Whitt Decl.") at ¶¶4-5, 7, 10, Ex. A). Consistent with the requirements of the CBA, newly-hired UTOs are placed on a 60-day probationary period. (Whitt Decl. ¶9, Ex. A). During that time, Operations Managers and Site Directors relied on feedback from Production Supervisors regarding the UTO's performance. (Whitt Decl. ¶9). After the 60-day probationary period, new employees are placed on the seniority roster and the CBA governs their eligibility for additional training or promotions. (Whitt Dep. 13:4-14:1; Whitt Decl. ¶10, Ex. A). Between 2011 and 2013, first line production employees earned between $13.00 and $18.00 per hour. (Declaration of Joy Parson ("Parson Decl.") at ¶5).

FPEOs, FOs, and UTOs work under the direction of a Production Supervisor. (Brown Dep. 23:25-24:20; Whitt Dep. 15:3-6). Production Supervisors are managed by the Operations Manager, who reports directly to the Site Director or Plant Manager overseeing plant operations. (Brown Dep. 28:8-9; Whitt Dep. 5:4-5, 6:11-15; Deposition of Joseph Russell ("Russell Dep.") at 10:10-14). Joseph Russell was the Plant Manager from September 2007 until January 2013. (Russell Dep. 6:18-20, 7:22-24). Tony Whitt replaced Russell in January 2013. (Whitt Dep. 5:4-5; Whitt Decl. ¶2).

**B.    Brown's Employment and Job Responsibilities at Aleris.**

Brown worked for Aleris[3] from 1972 until his resignation on June 26, 2013. (Brown Dep. 12:13-15, 92:3-7, Ex. J). He became a Production Supervisor in or around 1982, and held this position until his resignation. (Brown Dep. 13:15-25) ("I was a union guy for probably about 10 or 11 years, and then I went into salary or into boss"). As a Production Supervisor, Brown was responsible for overseeing the employees and the production on the ingot line. (Brown Dep.

---

[3] Brown worked for Aleris's predecessor, Wabash Alloys, LLC, until 2007. (Deposition of Joy Parson ("Parson Dep.") at 9:14).

22:24-25). When he became a Production Supervisor, he was no longer a union employee. (Brown Dep. 21:15-17).

### 1.      *Production Supervisor position description.*

Brown performed the same work and had the same responsibilities throughout his time as a Production Supervisor. (Brown Dep.at 40:4-16; 42:15-43:11, 50:3-20, Exs, E, F, G). His most recent job description included the following responsibilities:

- Monitor production output and quality data. Maintains time and production records. Compiles reports for management review. Provides hands-on operation of furnaces with responsibility for optimizing recoveries.

- Directly supervises up to 15 production employees.

- Improve safety performance by continuously increasing a level of awareness and improving the safety culture of employees to reduce, if not eliminate, accidents and injuries. […]

- Implement safety communication and training to establish safer working practices.

- Training employees; planning, assigning and directing work; appraising performance, disciplining employees; addressing complaints and resolving problems.

- Schedules and directs employees in assignment and completion of production work. Creates and trains a team of workers to achieve or exceed budgeted production goals while maintaining compliance with environmental and other regulatory requirements. […]

- Checks the types, quantity, and availability of materials needed to complete the production requirements for the shift. Checks records from the previous shift, and alerts maintenance of potential equipment problems.

- Establishes or adjusts work procedures to meet schedules. Determines overtime work schedule and approves time cards.

- Completes on a daily basis all production information to be entered into Oracle/Excel.

- Interprets instructions, specifications, or job orders to employees.

- Conducts meetings with employees and ensures compliance with all health, safety, and environmental regulations, and company policies and procedures.

- Analyzes and resolves or assists workers in resolving work related problems.

- Provides relief supervision on weekends, nights, and holidays or as needed. […]

(Brown Dep. 50:7-20, Ex. G). Brown performed all of these responsibilities as a Production Supervisor. (*Id.*). He regularly worked without direct supervision, especially on weekends. (Brown Dep. 39:16-17, Exs. E, G).

### 2. Daily operation of the ingot line.

Brown was primarily responsible for directing the work of the employees on the ingot line. (Brown Dep. 41:16-20, Ex. E). He directly supervised approximately six employees per shift, and had supervisory authority over approximately 18 total employees. (Brown Dep. 29:15-30:7, 46:15-18, 51:18, 56:3-6, Ex. H). During his shifts, he shared supervision of UTOs with the molten line Production Supervisor and the Shipping Supervisor. (Brown Dep. 46:15-18). Together, the supervisors decided where the UTOs were needed throughout a shift. (Brown Dep. 30:8-20).

Based on the order sheet Brown received at the start of each shift, he would decide what materials were needed for that day's production, make sure the employees he supervised performed their roles satisfactorily to complete the order, address any problems that arose on the line, and take responsibility for the quality of the final product that came off the line. (Brown Dep. 31:24-33:11, 36:13-16, 44:16-20; Russell Dep. 15:14-18). Because of his significant personal knowledge and experience with this process, Brown's opinion was weighed in setting realistic production goals for workers on his line. (Russell Dep. 16:20-17:2).

During each shift, Brown sampled alloys during the production process and decided which additional materials were needed after testing to produce the correct metal, requested the

necessary materials to continue production, and maintained the related production and furnace records. (Brown Dep. 45:5-46:7, 57:4-61:5, Ex. G). These records are necessary for reporting plant activity to regulatory bodies such as the Environmental Protection Agency. (*Id.*; Whitt. Dep. 30:1-5; Russell Dep. 18:20-25). Because of this role, production supervisors provide critical advice regarding procurement of materials for the furnace. (Brown Dep. Ex. G; Whitt Dep. 20:7-21, 23:5-7).

Once materials were procured and the line was ready to operate, Brown directed the production process by telling FPEOs how much material to put in at the beginning of the line. (Brown Dep. 24:18-23). He then monitored the line throughout his shift, deciding when to slow or speed up production, as he was personally responsible for ensuring completion of production goals. (Brown Dep. 27:19-28:15, 41:24-42:1, Exs. E, G). In fulfilling his role as a Production Supervisor, Brown participated in the work of the employees he supervised on an as-needed basis to ensure that production continued, sometimes for as much as 50 percent of a shift. (Brown Dep. 117:13-14, 118:16-119:6; Russell Dep. 19:24-20:3). However, his primary responsibility was supervising the line. (Russell Dep. 20:16-18; Brown Dep. 123:6-9, Exs. E, G). Brown was never assigned to perform manual labor, but rather used his own discretion to fill in if needed. (Brown Dep. 47:22-48:1, 117:13-14).

### 3. *Supervisory authority over ingot line employees.*

In addition to directing the production process, Brown exercised general supervisory authority over the employees on the ingot line. (Brown Dep. 42:6-9, Exs, E, G). He was responsible for providing employees with coverage so they could take designated breaks throughout their shifts. (Brown Dep. 47:22-48:12). He resolved complaints between employees and complaints from employees regarding working conditions. (Brown Dep. 49:15-22. Exs. E,

G). He supported his employees and tried to boost their morale so they would be more productive, by informing them of their production numbers. (Brown Dep. 110:9-12). Brown was personally responsible for training new employees on his shift, or assigning their training to an experienced employee to ensure the training was completed. (Brown Dep. 25:11-26:1, 124:3-13, Ex. G; Whitt Dep. 14:6-12). He also validated the newly trained employee's skills confirmation sheet certifying that the new employee had been adequately trained, and he provided feedback when managers asked how his employees were doing. (Brown Dep. 110:18-22; Whitt Dep. 14:6-12).

### 4.      *Responsibility for safety compliance.*

Brown ensured that his employees complied with safety regulations by wearing hard hats and glasses and following other safety procedures throughout their shift. (Brown Dep. 38:25-39:2, 42:10-12, Exs. E, G; Whitt Dep. 29:3-5; Russell Dep. 17:5-12). His role in safety enforcement at the plant was "probably the most critical in the organization," as Production Supervisors are responsible for communicating safety expectations to their crew at the start of a shift and enforcing the safety rules consistently. (Brown Dep. Ex. G; Whitt Dep. 27:20-28:5). In addition to leading crew safety meetings at the beginning of his shift, Brown participated with management in reviewing and amending the safety rules as necessary. (Brown Dep. Ex. G; Whitt Dep. 27:20-28:5; Russell Dep. 17:5-12).

### 5.      *Control over employee schedules.*

Because the line employees were union members, the CBA governed their schedules and overtime policies, but Brown was responsible for implementing the policies on a day-to-day basis. (Brown Dep. Exs. E, G; Russell Dep. 13:4-14:15). Brown decided when someone on his shift needed to work overtime, approved requests for time off, and confirmed when his

employees had worked overtime. (Brown Dep. 37:18-20, 38:8-10, 38:23-24, Ex. G; Whitt Dep. 19:23-21:1). He also had the authority to record his employees' hours in the time and attendance system, pursuant to the terms of the CBA. (Whitt Dep. 19:23-21:1). Brown made manpower recommendations to the Plant Manager when he needed additional employees. (Brown Dep., Ex. E; Whitt Dep. 12:4-10). Production supervisors have authority to interview prospective UTO candidates, although Brown did not recall doing so. (Whitt Dep. 11:3-13; Brown Dep. 119:23-24).

      **6.**    ***Authority to discipline and influence personnel decisions.***

Finally, Brown had authority to administer progressive discipline, including verbal warnings, written warnings, and suspensions, and he exercised this authority if an employee on his shift did something wrong or inappropriate. (Brown Dep. 49:23-50:2, Exs. E, G; Whitt Dep. 15:19-17:16; Russell Dep. 11:16-25). Production Supervisors could require an employee to leave until the organization contacted them about whether they could return to work. (*Id.*; Whitt Dep. 15:19-17:16). No individual at Aleris has absolute authority to terminate an employee; it is a group decision-making process. (Whitt Dep. 16:20-17:3).

    **C.**    **Brown's Compensation.**

For the duration of his employment, Brown was paid for all of the hours he recorded on his timesheets. (Brown Dep. 88:11-14, 100:2-5). Between January 2011 and his resignation in June 2013, Brown earned a base salary of between $70,000 and $80,000 per year. (Brown Dep. 91:15-22). In addition to his base salary, Brown earned straight overtime pay for all hours he recorded over 80 in a two-week period. (Brown Dep. 87:2-7). Aleris calculated Brown's straight hourly rate by dividing his annual base salary by 2080, the number of regular work hours in a year. (Parson Decl. ¶8). Brown's base salary in 2011 was approximately $71,000.00, creating a

straight hourly rate of approximately $34.00 per hour. (Parson Decl. ¶¶9, 10, Ex. A). His total compensation in 2011 was approximately $98,800.00. (*Id.*) His 2012 base salary was approximately $73,050.00, determining his related hourly rate of approximately $35.00 per hour. (Parson Decl. ¶11, Ex. A). His total compensation in 2012 was approximately $98,000.00. (*Id.*) His 2013 salary was approximately $75,060.00, creating a straight hourly rate of approximately $37.00 per hour. (Parson Decl. ¶12, Ex. A). Upon his resignation in June 2013, Brown had earned approximately $55,458.00 year to date. (*Id.*)

### III.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c)(a) provides the Court may properly grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party." *Blake v. Univ. of Notre Dame Du Lac*, No.: 3:08-CV-00070-WCL, 2009 U.S. Dist. LEXIS 57170, *2 (N.D. Ind. July 6, 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A motion for summary judgment is not defeated by the "'mere existence of some alleged factual dispute between the parties'" or "'some metaphysical doubt as to the material facts.'" *Blake*, 2009 U.S. Dist. LEXIS 57170 at *2 (quoting *Anderson*, 477 U.S. at 247; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000)). "The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case." *Blake*, 2009 U.S. Dist. LEXIS 57170 at *3 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

## IV.    ARGUMENT

Brown was an executive employee exempt from FLSA overtime requirements and is not entitled to any unpaid wages. The FLSA requires employers to pay employees overtime compensation for any hours worked in excess of 40 in a work week. 29 U.S.C. § 207(a)(1). Certain employees are exempt from the FLSA's overtime pay requirements. 29 U.S.C. § 213(a)(1). Because Brown was exempt under Section 213(a)(1), Aleris was not required to compensate him for overtime and his FLSA claim fails as a matter of law.

The FLSA provides a complete minimum wage and overtime pay exemption for "any employee employed in a bona fide executive...capacity." 29 U.S.C. § 213(a)(1) ("Executive Exemption"). An employee qualifies for the Executive Exemption if he or she satisfies the elements enumerated by 29 C.F.R. § 541.100(a), which states than an employee must:

1)  Be compensated on a salary basis at a rate of not less than $455 per week;

2)  Have the primary duty of management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

3)  Customarily and regularly direct the work of two or more other employees; and

4)  Have the authority to hire or fire other employees or make suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees which are given particular weight.

29 C.F.R. § 541.100; *Grass v. Damar Servs., Inc.*, 2014 WL 2773027, at *9 (S.D. Ind. June 19, 2014). Because Brown's work as a Production Supervisor satisfied each of these elements, he was an executive employee exempt from FLSA overtime requirements.

### A.    Brown's salary was significantly more than $455 per week.

To qualify as a "bona fide executive," an employee must receive a salary of at least $455.00 per week (approximately $23,000.00 per year). 29 C.F.R. § 541.100(a)(1). Brown's base

salary in 2011 was $71,000.00, and he actually earned approximately $98,800.00 with the addition of straight pay for overtime. (Parson Decl. ¶10, Ex. A). In 2012, his salary was $73,050.00, and he actually earned $98,000.00. (Parson Decl. ¶11, Ex. A). In 2013, his salary was $75,060, and he actually earned $55,458.00 for the first six months of 2013. (Parson Decl. ¶12, Ex. A ). Brown's salary significantly exceeded the necessary $455 per week.[4]

**B.    Brown's primary duty was management of a customarily recognized department.**

To qualify as an exempt executive employee, an employee must have as a primary duty the management of the enterprise in which he or she is employed or of a customarily recognized department or subdivision thereof. 29 C.F.R. § 541.100(a)(2). Brown meets each of the three subparts of this test. 29 C.F.R. § 541.100 *et seq.*

**1.    The ingot line is a customarily recognized department or subdivision.**

A "customarily recognized department or subdivision is intended to distinguish between a mere collection of employees assigned from time to time to a specific job or series of jobs and a unit with permanent status and function. A customarily recognized department or subdivision must have a permanent status and a continuing function." 2 9 C.F.R. § 541.103(a). The FLSA regulations make clear, however, that

---

[4] To the extent Brown claims that Aleris did not consider him an exempt employee because it paid him straight overtime compensation, such a claim is meritless. "An employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis." 29 C.F.R. § 541.604(b). Likewise, "[T]he exemption is not lost if an exempt employee who is guaranteed at least $ 455 each week paid on a salary basis also receives additional compensation based on hours worked for work beyond the normal workweek. Such additional compensation may be paid on any basis (e.g., flat sum, bonus payment, **straight-time hourly amount**, time and one-half or any other basis) . . .". *Id* Here, Brown was guaranteed his annual base salary, regardless of the hours he worked over 80 in a two week period. He cannot argue that because Aleris paid him *more* than he was entitled to receive, he is not properly exempt.

> [C]ontinuity of the same subordinate personnel is not essential to the existence of a recognized unit with a continuing function. An otherwise exempt employee will not lose the exemption merely because the employee draws and supervises workers from a pool or supervises a team of workers drawn from other recognized units, if other factors are present that indicate that the employee is in charge of a recognized unit with a continuing function.

29 C.F.R. § 541.103(d).

A work shift can constitute a department or subdivision. *West v. Anne Arundel County, Md.*, 137 F.3d 752 (4th Cir. 1998); *Molina v. Sea Land Services Inc.*, 2 F.Supp.2d 185 (D. P.R. 1998). In addition, "groupings" or "teams" may constitute a department or subdivision. 69 Fed. Reg. 22134 (Aug. 23, 2004), citing *Gorman v. Continental Can Co.*, 1986 U.S. Dist. LEXIS 30856 (N.D. Ill. Jan. 3, 1986); Preamble to 29 C.F.R. 541.

The ingot line at the Wabash facility is a customarily recognized department or subdivision of Aleris's operations with a permanent status. (Brown Dep. 22:24-25). The ingot line was one of the two primary production functions of the Wabash facility. (Brown Dep. 22:4-23:4). In addition, Brown's role within the department was consistent and permanent; he performed the same supervisory role there for more than 30 years. (Brown Dep. 12:13-15). Moreover, Brown supervised a distinct subdivision of the ingot production department when he supervised all employees on a particular shift. *See West*, 137 F.3d 752; *Molina*, 2 F.Supp.2d 185. Therefore, Brown met the requirement that he manage a "customarily recognized department or subdivision."

### 2. Brown's duties were "management" duties.

There can be no genuine issue of fact that Brown's primary duties were management in nature. The term "management" generally includes, but is not limited to, activities such as the following:

[1] interviewing, selecting, and training of employees; [2] setting and adjusting their rates of pay and hours of work; [3] directing the work of employees; [4] maintaining production or sales records for use in supervision or control; [5] appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; [6] handling employee complaints and grievances; [7] disciplining employees; [8] planning the work; [9] determining the techniques to be used; [10] apportioning the work among the employees; [11] determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; [12] controlling the flow and distribution of materials or merchandise and supplies; [13] providing for the safety and security of the employees or the property; [14] planning and controlling the budget; and [15] monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. This list is not intended to be exhaustive and other activities, evaluated on a case-by-case basis, may be considered managerial. 69 Fed. Reg. 22133 (Aug. 23, 2004); *Hicks v. Mercedes-Benz U.S. Int'l, Inc.*, 877 F. Supp. 2d 1161, 1168 (N.D. Ala. 2012) ("the regulations are clear that these factors, while helpful, are not exhaustive.").

Brown performed management duties that fall into at least 14 of the 15 categories listed above:

- Brown was responsible for training all of the employees on his line and verifying that they had been trained. (Brown Dep. 25:11-26:1, 124:3-13, Ex. G; Whitt Dep. 14:6-12). He had the ability to request additional employees and to interview prospective candidates. (Brown Dep. Ex. G; Whitt Dep. 11:3-13, 12:4-10).

- While the CBA controlled all hourly employees' rates of pay and standard hours of work (Russell Dep. 13:4-14:15), Brown decided when someone on his shift needed to work overtime and approved requests for time off. (Brown Dep. 37:18-20, 38:8-10, 38:23-24; Whitt Dep. 19:23-21:1). Because the CBA was controlling, this is the most authority any manager could exercise over employees' rates and hours. (Whitt Dep. 13:4-14:1).

13

- Brown was responsible for directing all of the work on the ingot line. (Brown Dep. 31:24-33:11, 36:13-16, 44:16-20, Ex. G; Russell Dep. 15:14-18).

- Brown maintained production and furnace records on every shift, which were integral both to the reporting requirements of the plant and for reference by senior management when procuring materials in the future. (Brown Dep. 45:5-46:7, 57:4-61:5, Ex. G; Whitt Dep. 20:7-21, 23:5-7, 30:1-5; Russell Dep. 18:20-25). Brown also used the production numbers in his supervisory capacity, sharing them with employees in order to boost morale. (Brown Dep. 110:9-12).

- Although promotions were awarded based on the terms in the CBA rather than the manager's appraisal (Whitt Dep. 13:4-14:1), Brown provided feedback on his employees' performance to senior management. (Brown Dep. 110:18-22).

- Regarding the sixth and seventh categories, Brown handled complaints and grievances as they arose on each shift, and administered discipline when warranted. (Brown Dep. 49:23-50:2, Ex. G; Whitt Dep. 15:19-17:6; Russell Dep. 11:16-25).

- Brown planned the operation of the ingot line at the start of each shift based on the day's order sheet. (Brown Dep. 31:24-33:11, Ex. G).

- Brown used his experience to tell employees how much material to put in at the top of the line, and ensure the proper combination of materials went into the furnace in the course of production. (Brown Dep. 24:18-23, 45:5-46:7).

- Brown apportioned the work among the employees on the ingot line. (Brown Dep. 23:25-24:20). Brown also consulted with the molten line Production Supervisor

and the Shipping Supervisor to decide which manager needed UTOs throughout a shift. (Brown Dep. 30:8-20).

- Because Brown was responsible for determining which materials went into the furnace on his shift, senior managers relied upon his input when they placed material orders. (Whitt Dep. 20:7-21, 23:5-7).

- Brown controlled the flow of materials on the line during his shift, and would decide to add or remove material based on the pace of production. (Brown Dep. 27:19-28:15). He was responsible for completing the production schedule each shift. (Brown Dep. 42:2-9, Ex. G).

- Brown was the primary manager responsible for the safety and security of the employees in his department and on his shift. (Brown Dep. Ex. G). This included ensuring that employees complied with safety regulations, communicating expectations to his crew at the start of each shift, enforcing the rules, and reviewing or amending them as necessary. (Brown Dep. 38:25-39:2, Ex. G; Whitt Dep. 27:20-28:5, 29:3-5; Russell Dep. 17:5-12).

- Brown's furnace monitoring tasks were part of the facility's compliance with legally required environmental standards. (Brown Dep. 60:5-13).

Brown's daily activities fit squarely within the activities identified as managerial by the regulations interpreting the executive exemption.

Moreover, Brown's responsibilities are consistent with those of other production supervisors deemed to meet the requirements of the Executive Exemption. *See Beauchamp v. Flex-n-Gate, LLC*, 357 F.Supp. 2d 1010 (E.D. Mich. 2005). In *Beauchamp*, the Eastern District of Michigan held a production supervisor in a manufacturing facility that assembled and shipped

automotive assembly parts was an exempt executive employee. 357 F.Supp. at 1019. The Court relied primarily on plaintiff's affirmation that he performed the duties in his position description, which included assigning work to production employees, estimating manpower to meet production needs, maintaining time and production records, resolving employee complaints, recommending changes to work procedure, requisitioning work materials, enforcing company policies, training employees, authorizing overtime, approving vacation, and disciplining employees. *Id.* at 1015. Brown's position description, which he affirmed accurately represented his duties as a Production Supervisor, included nearly identical duties to those enumerated in *Beauchamp*. (*See* Brown Dep. Ex. G). For example, Brown was charged with maintaining time and production records, "planning, assigning, and directing work; appraising performance, disciplining employees; addressing complaints and resolving problems" and "determin[ing] overtime work schedule and approve[ing] time cards." (Brown Dep. Ex. G).

Similarly, in *Haas v. Behr Dayton Thermal Prods., LLC*, the Southern District of Ohio found a production supervisor in a plant that manufactures engine heating and cooling systems for the automotive industry satisfied the Executive Exemption. 2008 U.S. LEXIS 122184 at *70-73 (S.D. Ohio 2008). There, the supervisor trained employees, maintained safety policies, disciplined, directed work, addressed work quality issues, counseled subordinates, assigned overtime consistent with union requirements, evaluated productivity, and determined techniques to be used. 2008 U.S. LEXIS 122184 at *70-73 (S.D. Ohio 2008). Brown's duties are also identical to those production supervisor duties enumerated in *Haas*. For example, Brown played a critical role in training on the ingot line either by training employees himself or assigning them to a trainer, and by affirming that an employee's training was complete. (Brown Dep. 25:11-26:1, 110:18-22, 124:3-13, Ex. G; Whitt Dep. 14:6-12). He also played an active role in ensuring

16

that employees knew about and adhered to safety regulations on each shift. (Brown Dep. 38:25-39:2, 42:10-12, Exs. E, G; Whitt Dep. 27:20-28:5, 29:3-5; Russell Dep. 17:5-12). He exercised control over overtime hours, consistent with the requirements of the CBA. (Brown Dep. Exs. E, G; Russell Dep. 13:4-14:15).

The Fifth Circuit also held that production supervisors at a foundry, manufacturing cast iron products, met the Executive Exemption where they planned and supervised the work of subordinate employees. *Rainy v. McWane, Inc.*, 314 Fed. Appx. 693 (5th Cir. 2009). The lead plaintiff in that case testified that his primary duty was "[w]atching, making sure [the employees were] working safe and doing, putting out good work," consistent with his job description, which stated he was responsible for "the planning and supervision of subordinate supervisors, hourly and incentive personnel." 314 F. App'x at 695. Likewise, Brown's primary duty was supervising employees and production on the ingot line. (Russell Dep. 20:16-18; Brown Dep. 123:6-9, Exs. E, G). Brown's duties as a Production Supervisor were management duties pursuant to the FLSA.

### 3.    These duties were Brown's "primary" duties.

Brown's management duties were his primary duties. "Primary duty" means the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). In determining an employee's primary duty, the key inquiry is the "character of the employee's job as a whole." *Id.* In considering whether a rule is an employee's primary duty, a Court should look at:

> [1] the relative importance of the exempt duties as compared with other types of duties; [2] the amount of time spent performing exempt work; [3] the employee's relative freedom from direct supervision; and [4] the relationship between the employee's salary and the wages paid to other employees for the kind of non-exempt work performed by the employee.

*Id.* Like the regulations defining "management," these factors are intended as a useful guide and are not intended to be exhaustive. *See Hicks*, 877 F. Supp. 2d at 1168.

First, Brown acknowledges that performing the exempt managerial duties outlined above was the most important part of his work from 1982 through his resignation in 2013. (Brown Dep. 41:16-20, 122:6-9, Exs. E, F, G).

Second, although the amount of time spent performing exempt work is a "useful guide," time alone "is not the sole test." 29 C.F.R. § 541.700(b). The regulations expressly state "[N]othing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." *Id.* "[C]oncurrent performance of exempt and non-exempt work does not disqualify an employee from the executive exemption if the requirements of §541.100 are otherwise met." 29 C.F.R. § 541.106. "Occasional" tasks performed as the "means for an exempt employee to properly carry out exempt functions and responsibilities are considered exempt work." 29 C.F.R. § 541.707.

Brown sometimes performed manual tasks for approximately 50 percent of a shift. (Brown Dep. 118:16-119:6). However, this was not his primary duty on any shift. (Brown Dep. 22:24-25; Ex. G). Brown was never assigned to perform manual labor, but rather used his own discretion to fill in if needed. (Brown Dep. 47:22-48:1, 117:13-14). Whenever Brown performed manual labor alongside his crew, he did so in order to fulfill his primary duty of ensuring that production continued on schedule. (Brown Dep. 122:12-124:2). Brown's primary duty was management and supervision; manual labor was merely a means to that end. The second element of the "primary duty" analysis is satisfied.

Brown met the third "primary duty" factor because he Brown regularly worked without direct supervision, especially on weekends. (Brown Dep. 39:16-17, Exs. E, G). Brown managed his shift without any day-to-day supervision.

Finally, Brown's salary was significantly higher than his subordinates'. *Compare* Parson Decl. ¶5 *with* ¶¶9-12, Ex. A). Brown earned a base salary of $71,000 in 2011, $73,050.00 in 2012, and $75,060.00 in 2013. (Parson Decl. ¶¶10-12, Ex. A). With the addition of straight overtime pay, his compensation each year was close to $100,000.00. (*Id.*) Conversely, the hourly employees Brown supervised on the ingot line earned between $13.00 and $18.00 per hour between 2011 and 2013. (Parson Decl. ¶5). Assuming 2080 hours a year, the average first line employee would earn between $27,040 and $43,680 a year. For these reasons, Brown's job responsibilities and compensation meet every factor in the "primary duty" element of the Executive Exemption.

### C.   Brown's personnel recommendations were given particular weight.

An exempt executive employee must either have "the authority to hire or fire other employees" or his "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees must be given particular weight." 29 C.F.R. § 541.100(a)(4). No individual at Aleris has absolute authority over hiring and firing decisions due to the controlling CBA. (Whitt Decl. ¶¶5-10, Ex. A). There is no dispute, however, that Brown had significant influence over personnel decisions within the confines of the CBA.

Every new production employee at the Wabash facility is hired as a UTO. (Whitt Dep. 13:4-14:1; Whitt Decl. ¶7). Consistent with the requirements of the CBA, newly-hired UTOs are placed on a 60-day probationary period. (Whitt Decl. ¶9). During that time, Operations Managers and Site Directors rely on feedback from Production Supervisors regarding the UTO's

performance. (Whitt Decl. ¶9). Consistent with the requirements of the CBA, after the 60-day probationary period, new employees are placed on the seniority roster and the CBA governs their eligibility for additional training or promotions. (Whitt Dep. 13:4-14:1; Whitt Decl. ¶10). Also pursuant to the CBA, no individual at Aleris has absolute authority to terminate an employee; it is a group decision-making process. (Whitt Dep. 16:20-17:3).

Within this context, however, there is no dispute that Brown had the authority to:

- Request the organization hire additional manpower for his line (Brown Dep., Ex. E; Whitt Decl. ¶8);

- Train new employees (Brown Dep. 25:11-26:1, 124:3-13, Ex. G);

- Independently resolve employee complaints (Brown Dep. 49:15-22, Exs. E, G);

- Validate new employees' skills confirmation sheet to management (Whitt Dep. 14:6-12);

- Provide feedback regarding employee performance (Brown Dep. 110:18-22, Exs. E, G);

- Administer progressive discipline (Brown Dep. 49:23-50:1, Exs. E, G); and

- Suspend employees while the organization considered termination (*Id.*).

Brown's influence over personnel actions equals or exceeds the duties of other supervisors who qualify for the Executive Exemption.

An employee's suggestions and recommendations may be deemed to have "particular weight" in workplaces where a higher level manager's recommendation has more importance, where the employee does not have authority to make the ultimate decision as to the employee's change in status, and where hiring and firing is controlled by a separate institution, such as a staffing agency or a union. 29 C.F.R. § 541.100(a)(4); *Beauchamp*, 357 F. Supp. 2d at 1016; *Haas*, 2008 US Dist. LEXIS 122184 at *82; *see also Schreckenbach v. Tenaris Coiled Tubes, L.L.C.*, 2013 U.S. LEXIS 6744 at *19 (S.D. Tex. 2013).

In *Beauchamp*, the company hired new employees through a temporary agency, but the temporary workers' production supervisor recommended retention. 357 F. Supp. 2d at 1016. The Court concluded this practice "comports with the regulatory requirement that an executive's suggestions and recommendations as to hiring 'are given particular weight.'" *Id.* (citing 29 C.F.R. § 541.100(a)(4); 29 C.F.R. § 541.105). Following the same standard, the *Haas* Court also found production supervisors met the "particular weight" standard where they had authority to suspend employees and "to make recommendations about the retention" of employees in a workplace with a controlling CBA. 2008 U.S. LEXIS 122184 at *86. The plaintiff production supervisor in *Shreckenbach* likewise had the authority to suggest discipline, and management routinely followed his suggestions. 2013 U.S. LEXIS 6744 at *19. Finding that the supervisor's influence was enough to satisfy the "particular weight" test, the Court stated "If final decision-making authority were the test for determining whether a person was an executive or administrative employee, few would ever qualify as such an employee under the regulations." *Id.* Rather, supervisors may satisfy this element where they evaluate workers and then provide recommendations regarding their retention to primary decision makers. *See Rainy*, 314 Fed. Appx. at *693 (finding that supervisor had hiring authority where he evaluated provisional workers and provided recommendations regarding their retention).

Analogous to the exempt supervisors in *Haas, Shreckenbach,* and *Rainy*, Brown made manpower recommendations when he needed additional employees, administered discipline, and provided feedback regarding employees' performance when called upon to do so by his managers. (Brown Dep. 110:18-22, Exs. E, G; Whitt Decl. ¶¶8, 9). This feedback was considered when evaluating the employees. (*Id.*). Further, Brown administered progressive discipline, including suspensions while the organization considered whether to terminate an employee.

21

(Brown Dep. 119:23-24, Exs. E, G; Whitt Dep. 15:19-17:16). This was a significant amount of decision-making authority consistent with other managers bound by the CBA. (*Id.*) At a minimum, Brown's personnel recommendations were given "particular weight" and he met this element of the Executive Exemption.

**D.    Brown customarily and regularly directed the work of more than two employees.**

Finally, Brown does not dispute that at all times during his tenure as a production supervisor, he supervised approximately six employees per shift on the ingot line by performing the managerial duties described above. (Brown Dep. 46:15-18). This satisfies the number of subordinates required by 29 C.F.R. § 541.100(a)(3) to meet the Executive Exemption.

## V.    CONCLUSION

Aleris properly classified Brown as an executive employee exempt from the FLSA's overtime requirements. He was not entitled to time and a half compensation for any hours over 40 worked in a week in addition to the nearly $100,000 he earned annually. Aleris does not owe Brown for any unpaid wages. Brown's claim should be dismissed as a matter of law.

Respectfully submitted,

*/ s / Alan L. McLaughlin*
Alan L. McLaughlin (#10182-49)
Emily L. Connor (#27402-49)

LITTLER MENDELSON, P.C.
111 Monument Circle, Suite 702        *Attorneys for Defendant, Aleris Specification*
Indianapolis, IN 46204               *Alloys, Inc. and Wabash Alloys, LLC*
Telephone: 317.287.3600
Facsimile:  317.636.0712
E-mail: amclaughlin@littler.com
        econnor@littler.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have this 25th day of September, 2015, filed a copy of the foregoing

*Defendant's Brief in Support of Motion for Summary Judgment* electronically.  Notice of this

filing will be sent to the following parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

William A. Ramsey
Barrett McNagny
215 East Berry Street
Fort Wayne, Indiana 46802
war@barrettlaw.com


*/ s / Alan L. McLaughlin*
Alan L. McLaughlin